

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

FJN:AA/IC/JRS
F. # 2022R00230

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 11, 2023

By E-mail and ECF

The Honorable Taryn A. Merkl
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. David Mccann et al.
     Criminal Docket No. 23-08 (WFK)

Dear Judge Merkl:

  The government respectfully submits this letter in support of its application for the entry of a permanent order of detention for defendants David Mccann, Tajhai Jones, Raymond Minaya, and Calvin Tabron (the "defendants"). As described below and in the seven-count indictment, the defendants engineered a gun-trafficking conspiracy that distributed over 50 deadly guns into our community, including "ghost guns," guns with defaced serial numbers, and guns used in shootings. Two defendants also engaged in significant narcotics trafficking conspiracies, and Mccann engaged in a fentanyl distribution conspiracy that introduced thousands of lethal doses of fentanyl into our community. For these reasons and the reasons set forth below, the government respectfully submits that the defendants are both a danger to the community and a flight risk and that no condition or combination of conditions can reasonably secure their appearance at trial or the safety of the community. Accordingly, the defendants should be detained.[1]

I. Background

  A. Offense Conduct

  Since January 2022, the government has investigated the unlawful trafficking of firearms and narcotics in and around the Breukelen Houses, a public housing complex located in the Canarsie neighborhood in Brooklyn, New York. Together with others, the defendants sold over 50 guns, including to an undercover officer (the "UC"). The defendants, of course, did not

---

[1] Jones and Tabron have been arrested in Virginia and will first appear in removal hearings there.

believe they were selling guns to a law enforcement officer.[2]  Instead, the undercover officer told the defendants that he was a drug dealer who needed guns and that he was also going to resell some of the guns that were provided to him.  For example, text messages between the UC and Mccann and Minaya show that both Mccann and Minaya understood the UC to be a drug dealer, and that the UC would often purchase guns from Mccann and Minaya only to resell them to others.  Despite this knowledge, Mccann and Minaya continued to sell large quantities of drugs and guns to the UC without hesitation.

       Mccann, who introduced the UC to his co-defendants, served as a leader and facilitator of the scheme, brokering deals for guns and drugs from different suppliers, including defendants Jones, Minaya, and Tabron.  The conspirators procured the guns from numerous sources—some of the guns were already in illegal circulation in Brooklyn, while others were trafficked from Virginia to Brooklyn by Tabron and Jones.  The investigation revealed that defendant Tabron would often purchase three or four guns at a time from retailers in Virginia Beach and Lynnhaven, Virginia, for the express purpose of bringing them to Brooklyn to engage in sales set up by his co-defendants.

       Law enforcement has linked guns trafficked by the conspiracy with multiple, serious shootings in Brooklyn.  On June 22, 2022, Minaya sold to the UC a Glock 30, .45 caliber handgun, which is linked to an August 16, 2021 shooting where armed perpetrators shot into a large crowd gathered in the Bedford-Stuyvesant neighborhood for a family day celebration.  In total, eight individuals were struck by gunfire.  Another gun trafficked by Minaya to the UC on July 19, 2022, a Glock 43 9 millimeter caliber handgun, was linked to a December 18, 2021 shooting of an individual in Canarsie, in the blocks surrounding the Breukelen Houses complex.  That individual sustained multiple gunshot wounds to his body, including his right hand, shoulder, neck, and the base of his skull.

       While committing the gun trafficking conspiracy, Mccann and co-conspirators also sold more than 1,000 grams of fentanyl, a lethal and addictive synthetic opioid, to the UC.  Mccann and Minaya also engaged in a narcotics conspiracy that sold over 100 grams of cocaine base to the UC.

       All the defendants are charged with unlawful firearms trafficking conspiracy, in violation of Title 18, United States Code, Sections 371, 922(a)(1)(A), and 933.  The first count of the indictment charges the defendants with violating the gun trafficking provisions of the Bipartisan Safer Communities Act, Pub. L. No. 117-159, § 12004, 136 Stat. 1313 (2022) (codified at 18 U.S.C. § 933).  Congress passed this law in part to curb the recent rise of gun violence throughout the United States by criminalizing firearms trafficking and the straw purchase of guns.  Further, because Jones and Minaya are convicted felons, they are also charged with being felons in possession of firearms, in violation of Title 18, United States Code, Section 922(g)(1).  In addition, Minaya is charged with possession of a gun with an obliterated serial number, in violation of Title 18, United States Code, Section 922(k).  Mccann is also charged with conspiracy to distribute and possess with intent to distribute fentanyl, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B)(vi).  Mccann and Minaya are also

---

[2]  The UC covertly audio and video recorded many drug and gun transactions.

charged with conspiracy to distribute and possess with intent to distribute cocaine base, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(C).

The defendants' drug and gun deals occurred primarily in vehicles outside homes in the Breukelen Houses. Almost all the deals occurred in the middle of the afternoon and in broad daylight, with the dealers sometimes brazenly walking down public streets carrying bags of dangerous guns. In addition, many of these transactions took place during the summer months at the Canarsie Pier—a popular recreational area where scores of Brooklyn families kayak, picnic, and play with their children at the playground. As pictured further below, many of the guns were handguns that could be easily concealed. Additionally, some of the guns had defaced serial numbers or were made from "ghost gun" kits so that they would be more difficult to track by law enforcement.[3]

B.    Criminal History

Apart from the serious nature of the instant offenses, two of the defendants, Minaya and Jones, also have violent criminal histories.

Jones has multiple serious convictions. On July 21, 2015, Jones and a co-conspirator wore masks while violently breaking into a Virginia home. The men abducted one victim in front of the house and then forced him to return inside at gunpoint. Once inside, Jones and his co-conspirator held three victims at gunpoint, robbing them of their money and medication. On September 6, 2017, Jones was convicted in Virginia Circuit Court of abduction, armed burglary, and use or display of a firearm in the commission of a felony. On April 28, 2020, Jones was also charged with possession of schedule I or II narcotics, of which he was convicted on April 26, 2021.

Minaya likewise has a lengthy history of criminal conduct. On May 3, 2017, Minaya was convicted in Kings County Supreme Court of attempted murder in the second degree, and sentenced to 7 years' imprisonment and five years' probation. The attempted murder conviction arose out of Minaya shooting another individual in broad daylight. Also on May 3, 2017, Minaya was convicted in Kings County Supreme Court of robbery in the third degree and sentenced to one year imprisonment. The robbery conviction arose out of Minaya robbing a victim of a cell phone and striking the victim in the face, causing a laceration. Minaya was released on parole on September 17, 2020.[4] On September 28, 2016, Minaya was convicted in Kings County Supreme Court of conspiracy to perform a felony in the fourth degree and sentenced to one year imprisonment.

---

[3] A ghost gun is a firearm made from kits which include all the parts and often the equipment necessary to build a complete firearm. Ghost guns generally do not have serial numbers, which makes it more difficult for law enforcement to trace them.

[4] The government is also aware of uncharged violent conduct by Minaya. On or about March 18, 2022, Minaya exchanged gunfire with another individual in the Bay View public housing complex in Canarsie.

Further, when Minaya was arrested on the charges in this case, law enforcement observed guns and gun parts being thrown out of his apartment window. Among other items, law enforcement recovered a handgun and a fully loaded extended magazine on the ground outside (pictured below). Moreover, a magazine was found on top of the scaffolding outside of his apartment building and a Glock 43 handgun was recovered in Minaya's interior hallway.

 

II.   Legal Standard

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). A finding of dangerousness must be supported by clear and convincing evidence, United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), and risk of flight must be proven by a preponderance of the evidence, United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, including whether the offense involved a controlled substance or a firearm; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g).

Additionally, the possibility of a severe sentence is an important factor in assessing a defendant's likelihood of flight. See United States v. Jackson, 823 F.2d 4,7 (2d Cir. 1987); United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses whose maximum combined terms created potent incentives to flee); United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver

penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). In the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffer. LaFontaine, 210 F.3d at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." Id. (internal quotation marks omitted); see also United States v. Mercedes, 254 F.3d 433, 437 (2d Cir. 2001) ("[The defendant] has twice been convicted of weapon possession—one felony conviction, and one misdemeanor conviction. We find the district court committed clear error in failing to credit the government's proffer with respect to [the defendant's] dangerousness.").

Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

III. Argument

The Bail Reform Act counsels in favor of the defendants' detention here. The government more than meets its burden of showing by clear and convincing evidence that the defendants pose a danger to the community based on their trafficking of dozens of dangerous guns. Moreover, the overwhelming evidence gathered during the investigation, coupled with the high penalties the defendants face, give them a strong incentive to flee and to obstruct justice. Accordingly, the government can likewise show by a preponderance of the evidence that the defendants pose a flight risk.

A. The Defendants Pose a Serious Danger to the Community

The defendants should be detained pending trial because they pose a serious danger to the community. See 18 U.S.C. § 3142(g). The defendants conspired to flood our community's streets with lethal and easily concealed guns. Many of these guns had defaced serial numbers or were "ghost guns," purposely designed to avoid detection by law enforcement. The way the defendants sold the guns also endangered our neighbors in Brooklyn: the defendants engaged in these sales outside a public housing complex that houses over 4,000 men, women, and children. Other sales took place in a public park in the middle of the spring and summer. Worse still, these sales often occurred in broad daylight, which demonstrates the brazenness of the defendants in disobeying the law.

Courts regularly order detention in cases involving gun trafficking or possession. See United States v. Clarke, No. 22-CR-341 (LDH), ECF Nos. 4, 13, 14 (E.D.N.Y. June 28, 2022) (ordering detention of defendants involved in a firearms trafficking conspiracy); United States v. Smalls, No. 20-CR-126, 2020 WL 1866034, at *1 (S.D.N.Y. Apr. 14, 2020) (affirming a magistrate judge's order of detention that was based, in part, on "the general danger to the

5

community posed by [the defendant's] apparently ready access to firearms"); United States v. Williams, No. 20-CR-293-2, 2020 WL 4719982, at *3 (E.D.N.Y. Aug. 13, 2020) ("[T]he danger of Defendant's release is demonstrated through the fact [that] Defendant's instant and past offense involved the use of a firearm."); United States v. Thompson, 436 F. Supp. 3d 631, 636 (W.D.N.Y. 2020) (ordering detention against defendant responsible for firearms and narcotics trafficking offenses); United States v. Gumora, 454 F. Supp. 3d 280, 291 (S.D.N.Y. 2020) (defendant charged with being a felon-in-possession and possession of narcotics held without bond on dangerousness grounds, despite his contention that his asthma put him at "increased risk of getting severely ill or dying" from COVID-19 while incarcerated); United States v. Harris, No. 19-CR-300, 2020 WL 4014901, at *7 (S.D.N.Y. July 16, 2020) ("Defendant's arrest for being a felon in possession itself raises the specter of danger to the community."); United States v. Nikolow, 534 F. Supp. 2d 37, 39 (D.D.C. 2008) ("While the charges against the defendant do not involve violent acts, the defendant's illegal possession of 15 firearms in his store and his residence renders him a danger to the community.").

Several of the recovered guns—which were semi-automatic handguns that could be easily concealed—are pictured below.

 



6



Other guns that the defendants sold to the UC were designed to avoid tracing by law enforcement because they are "ghost guns" or have defaced serial numbers. For example, Mccann facilitated the sale of the "ghost gun" to the UC, as pictured below.



One of the firearms with an obliterated serial number is pictured below.



Moreover, two of the defendants—Mccann and Minaya—also sold significant quantities of narcotics. Mccann and his co-conspirators sold more than 1,000 grams of fentanyl, which amounts to thousands of deadly doses. Mccann and Minaya also conspired to sell over 100 grams of cocaine base.

Synthetic opioids like fentanyl and fentanyl analogues are killing a staggering number of Americans—with the number of deaths climbing each year. According to the National Institutes of Health, overdose deaths from synthetic opioids rose to 56,516 people in 2020. The nearly vertical blue line in the below chart illustrates the unprecedented lethality of fentanyl.



See National Institutes of Health, Overdose Death Rates, https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates.

The history and characteristics of the defendants, including the violent criminal history of Minaya and Jones, further demonstrate that they are too dangerous to be released. Jones was convicted of a gunpoint abduction and home invasion robbery. Minaya stands convicted of attempted murder and robbery and has also been involved in a shootout in broad daylight.

B.  The Defendants Pose a Flight Risk

The defendants should also be detained pending trial because they are flight risks.

First, each defendant faces significant punishment. All are charged with firearms trafficking offenses that carry a term of imprisonment up to 15 years' imprisonment. See 18 U.S.C. § 933(b). Minaya is also charged with conspiring to distribute cocaine base, an offense punishable by up to 20 years' imprisonment, and Mccann is charged with conspiracy to distribute over 40 grams of fentanyl, an offense that carries a mandatory minimum of 5 years' imprisonment up to 40 years' imprisonment.

The likelihood of a lengthy term of imprisonment gives the defendants a strong incentive to flee. See United States v. Blanco, 570 F. App'x 76, 77 (2d Cir. 2014) (affirming district court's order of detention where defendants face lengthy term of imprisonment). It also minimizes any risk that pre-trial detention would result in an over-served sentence.

Second, the weight of the evidence also heightens the incentive to flee. The evidence of the defendants' involvement in the alleged conduct is overwhelming. The UC conducted controlled buys of guns and drugs from the defendants that were heavily documented, including at times by video (as pictured below). The evidence also includes text and telephone records showing communications among the co-conspirators and with the UC around the times of the buys, GPS and social media evidence showing the defendants' whereabouts at particular times, in-person surveillance, and physical evidence including firearms, ammunition and narcotics. Where, as here, the evidence of guilt is strong, it provides "a considerable incentive to flee." United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993); see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased").

9



Raymond Minaya



David Mccann



Calvin Tabron



Tajhai Jones

Third, the defendants lack ties to the community. Two of the defendants—Tabron and Jones—do not live anywhere in or near the district. Rather, they used Brooklyn as the dumping ground for their deadly guns.

Fourth, Minaya has a history of violating court instructions. For example, he is on New York parole until about September 17, 2025, yet has participated in the charged conduct, in addition to the violent uncharged conduct set forth above.

IV.	Conclusion

For the foregoing reasons, the government respectfully requests that the Court issue a permanent order of detention.

Respectfully submitted,

BREON PEACE
United States Attorney

By:	/s/
Adam Amir
Irisa Chen
James Simmons
Assistant U.S. Attorneys
(718) 254-7000

cc:	Clerk of Court (TAM) (by email)
Defense Counsel (by email)

11