

U.S. Department of Justice

United States Attorney
Eastern District of New York

RMP:AA/IC/JRS  
F. #2023R00212

271 Cadman Plaza East  
Brooklyn, New York 11201

June 17, 2025

By ECF

The Honorable William F. Kuntz II  
United States District Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

        Re:    United States v. Raymond Minaya  
                  Criminal Docket No. 23-8 (WFK)

Dear Judge Kuntz:

      The government respectfully submits this letter in advance of defendant Raymond Minaya's sentencing, which is scheduled for June 24, 2025. On March 15, 2024, the defendant pled guilty to Counts One and Six of the Indictment, which charged him with firearms trafficking conspiracy, in violation of 18 U.S.C. §§ 933(a)(3) and 933(b), and conspiracy to distribute and possess with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). At his plea hearing, the defendant also allocuted to attempting to conceal and/or destroy additional firearms and ammunition upon arrest. The defendant's crimes in the instant case follow a lengthy and serious criminal history, including violent robbery, assaults on inmates while in state custody, and attempted murder. Since the defendant's plea hearing, he has continued to endanger the community and break the law at the Metropolitan Detention Center ("MDC"), including by possessing contraband phones and a dangerous weapon. For these reasons, and the reasons set forth below, the government seeks a sentence at the top of the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") or 188 months' imprisonment.

    I.    Background

        A.    Offense Conduct

      Raymond Minaya, also known as "Tooth" and "Blam," was a member of a large-scale firearms and narcotics trafficking ring that operated in and around the Breukelen Houses, a public housing complex located in the Canarsie neighborhood of Brooklyn, New York. Over the course of the government's investigation, Minaya, his co-defendants, and other co-conspirators flooded our community with illegal guns and narcotics—selling 55 guns and over 1,000 grams of illegal drugs, including fentanyl and cocaine base, to an undercover law enforcement officer (the "UC") who was posing as a gun reseller and drug dealer. See Pre-Sentence Investigation Report ("PSR") ¶¶ 12-13. In total, Minaya personally sold at least 12 firearms, including easily concealed

semi-automatic handguns. PSR ¶ 12. Other firearms sold by Minaya had defaced serial numbers.[1] Between April and July 2022, Minaya sold narcotics to the UC that totaled 89.621 grams of cocaine base and 16.1 grams of fentanyl. PSR ¶ 13.

Law enforcement has linked guns trafficked by Minaya with multiple serious shootings in Brooklyn. See PSR ¶ 18, 30. On June 22, 2022, Minaya sold to the UC a Glock 30, .45 caliber handgun, which was used in an August 21, 2021 shooting where armed perpetrators shot into a large crowd gathered in the Bedford-Stuyvesant neighborhood during a family day celebration. In total, eight individuals were struck by gunfire. Another gun trafficked by Minaya to the UC on July 19, 2022, a Glock 43 9 millimeter caliber handgun, was used in a December 18, 2021 shooting of an individual in Canarsie, in the blocks surrounding the Breukelen Houses complex. That individual sustained multiple gunshot wounds to his body, including his right hand, shoulder, neck, and the base of his skull, and ultimately survived his injuries. By trafficking these firearms as well as ghost guns and those with defaced serial numbers, the defendant facilitated the circulation of guns meant for use in criminal activity.

Upon his arrest on January 11, 2023, Minaya also sought to conceal his criminal conduct and ties to firearms by discarding several other firearms and ammunition magazines in his possession, as pictured below. PSR ¶ 15. The defendant threw firearms and firearm parts from his window and into the hallway of his apartment building. Id. Law enforcement subsequently recovered a handgun and a fully loaded magazine on the ground outside of Minaya's residence. Id. Law enforcement also recovered a firearm magazine from the scaffolding outside the residence, and a loaded Glock 43 handgun from the interior hallway. Id.




Minaya, along with his co-defendant Mccann, is a member of the Gorilla Stone set of the Bloods gang ("Gorilla Stone"). Gorilla Stone has many members across New York and is an organized street gang that sells narcotics and commits shootings and other violent acts throughout the region. To promote the gang, members, such as Mccann, would take photographs

---

[1] Defacing a gun's serial number hinders law enforcement's ability to trace the gun and is a strong indication that the gun is used in criminal activity.

of himself with other gang members, such as Minaya, with emojis and gang signs; below is a screenshot of such a social media post by Mccann with Minaya.



    B.    <u>Criminal History</u>

On October 28, 2015, Minaya was convicted of conspiring to perform a Class B or C Felony in Kings County Supreme Court in Brooklyn, New York. PSR ¶ 52. Specifically, while incarcerated on Rikers Island Correctional Facility in Queens, New York, Minaya reported whereabouts information for a Crips gang member to a co-conspirator on multiple occasions. <u>Id.</u> On January 9, 2015, Minaya called the co-conspirator and discussed a plan to kill the Crips member. <u>Id.</u> In another instance, the co-conspirator ordered Minaya to "clap" a different Crips member and gave Minaya a description of the Crips member's physical appearance. <u>Id.</u> Minaya questioned an inmate who matched the description provided by the co-conspirator but determined the inmate was not the Crips member whom the co-conspirator was seeking. <u>Id.</u>

On September 22, 2013, Minaya was convicted of robbery in the third degree in Kings County Supreme Court in Brooklyn, New York. PSR ¶ 50. Specifically, on September 16, 2013, Minaya and two others approached and surrounded a victim. Minaya grabbed the victim by the throat and pushed him over a fence before taking a MetroCard and an iPhone from the victim's person. <u>Id.</u> Minaya struck the victim in the face with a closed fist, causing a laceration to the victim's face. <u>Id.</u> On May 3, 2017, Minaya was sentenced to one year of custody.

On September 22, 2013, Minaya was convicted of attempted murder in Kings County Supreme Court in Brooklyn, New York. PSR ¶ 51. Specifically, between August 1, 2013 and August 15, 2013 at 2028 Rockaway Park in Brooklyn, New York, Minaya displayed a firearm

and threatened to shoot an individual ("Victim-1"), who Minaya then chased. Id. On August 1, 2013, Minaya displayed a firearm and threatened to shoot another individual ("Victim-2"), whom Minaya then chased. Id. On September 20, 2013, at the same location, in a public playground, Minaya displayed a firearm and fired several shots at Victim-2, none of which struck Victim-2, but one of which struck Victim-1 in the buttocks. Id. According to a local presentence report, Minaya admitted his guilt and that he shot someone, but "declined to provide a motive for his violent actions as he appeared remorseless during his admission." On May 3, 2017, Minaya was sentenced to 7 years of custody and 5 years of post-release supervision. Id. On September 17, 2020, he was released on parole—which he was serving when he committed the offense conduct for which he is being sentenced. Id.

Based on the foregoing, the defendant's criminal history score is five, yielding a Criminal History Category of III. PSR ¶ 55.

    C.    <u>Disciplinary Infractions in State Custody</u>

The defendant was cited for 15 disciplinary infractions while in state custody, including most seriously three separate assaults on inmates, four instances of violent conduct, and two instances of possession of a weapon. See PSR at p. 16-18.

Among the more serious incidents, on August 12, 2019, Minaya was disciplined for violent conduct, fighting, and creating a disturbance. PSR at p. 17. He was sanctioned to 90 days of confinement in the Special Housing Unit ("SHU"), 90 days of loss of package and commissary privileges, 10 days of pre-hearing "keeplock" disciplinary solitary confinement, and 90 days of loss of phone privileges. Id.

On November 14, 2018, Minaya was disciplined for possession of a weapon, violent conduct, fighting, gang activity, creating a disturbance, and assault on an inmate. Id. He was sanctioned to 113 days of SHU confinement, 113 days of loss of package and commissary privileges, and 3 months of loss of good conduct time. Id.

On September 11, 2017, Minaya was disciplined for violent conduct and assault on an inmate. Id. He was sanctioned to 158 days of SHU confinement and 158 days of loss of recreation, package, commissary and phone privileges. Id.

On June 3, 2015, Minaya was disciplined for conduct including assault on an inmate, possession of a weapon, possession of contraband, and fighting. Id. at 18. He was sanctioned to 152 days of SHU confinement, 152 days of loss of recreation, package, commissary, and phone privileges, and 90 days of loss of good conduct time. Id.

4

D. <u>Disciplinary Infractions in Federal Custody</u>

The defendant has been detained at the MDC since his January 11, 2023 arrest. Since his March 15, 2024 guilty plea, the defendant has been cited for three infractions at the MDC, including the possession of a sharpened metal weapon.

On January 15, 2025, MDC staff recovered contraband from Minaya's cell behind the inmate locker. Ex. A. In particular, Minaya possessed one blue Apple iPhone and one white cellular phone charger, both of which were confiscated. <u>Id.</u>

On November 14, 2024, MDC staff recovered contraband from Minaya's cell. Ex. B. In particular, Minaya possessed one black Apple cellular phone and one sharpened metal object measuring 8.5 inches in length—both of which staff found under the toilet bowl of his cell. <u>Id.</u> at 1. Minaya admitted his guilt, stating "I'm guilty of the knife." <u>Id.</u> at 8. After a hearing, Minaya was disciplined and lost good conduct time for 41 days and phone privileges for 210 days. <u>Id.</u> at 10.

On March 28, 2024, MDC Staff recovered one purple Motorola cellular phone from Minaya's cell. Ex. C. <u>Id.</u> at 1. Minaya admitted his guilt. <u>Id.</u> at 3. After a hearing, Minaya received discipline of loss of good conduct time for 41 days and loss of visit privileges for one year. <u>Id.</u> at 9.

Photographs from a contraband phone shows Minaya smoking on a video call with other inmates.



5

In another photograph, Minaya is seen handling bags of leafy substances with his distinctive hand tattoo visible. Text superimposed on the photograph "gotta get up in my bag," likely refers to Minaya earning money from the sale of the narcotics.[2]



E.   Rules Regarding Contraband at the MDC

When inmates arrive at the MDC they are provided with an "Inmate Admission & Orientation Handbook," which, among other things, lists prohibited acts within the facility and the available sanctions for violations. The most serious prohibited acts are deemed the "greatest severity level prohibited acts." These acts include the "possession, manufacture, introduction, or loss of a hazardous tool." Such "hazardous tools" include items that are "hazardous to institutional security or personal safety; e.g., . . . portable telephone, pager, or other electronic device." Other violations of this same severity include (1) killing; (2) escape from escort; (3) possession of a firearm; (4) rioting; (5) taking hostages and (6) sexual assault. Further, 18 U.S.C. § 1791 criminalizes possession of contraband in a federal facility, such as the MDC. See 18 U.S.C. § 1791(a)(2) ("Whoever . . . being an inmate of a prison, makes, possesses, or obtains, or attempts to make or obtain, a prohibited object . . . shall be punished . . . .").

---

[2]   Additional images appear possibly related to a contraband smuggling scheme, including images of pellets, money transfers, and dried leafy substances.

6

II. <u>Applicable Law</u>

The Supreme Court has explained that a "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007) (citation omitted).

Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." <u>Id.</u> at 50 (citation and footnote omitted). Specifically, 18 U.S.C. § 3553(a) requires that, in imposing a sentence, a court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." <u>United States v. Alexander</u>, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

III. Guidelines Calculation

    A. The Parties' Stipulated Guidelines Range

The Guidelines offense level to which the defendant stipulated in the plea agreement is as follows.

Count One: Gun Trafficking Conspiracy:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. § 2K2.1(a)(1)) | | 22 |
| Plus: | More than 25 Firearms (§ 2K2.1(b)(1)) | +6 |
| Plus: | Obliterated Serial Number (§ 2K2.1(b)(4)) | +4 |
| Cap: | Offense Level May Not Exceed 29 Based Upon (b)(1) – (b)(4)[3] | 29 |
| Plus: | Trafficking of Firearms (§ 2K2.1(b)(5)) | +4 |
| Total: | | 33 |

Count Six: Cocaine Base Trafficking Conspiracy:

| | | |
|---|---|---:|
| Base Offense Level (§ 2D1.1(c)(7)) | | 26[4] |
| Plus: | Firearm Possessed (§ 2D1.1(b)(1)) | +2 |
| Total: | | 28 |

---

[3] As relevant here, under U.S.S.G. § 2K2.1(b)(4), the Guidelines cap at level 29 "[t]he cumulative offense level determined from the application of subsections (b)(1) through (b)(4)[.]" Accordingly, the offense level is reduced to level 29.

[4] The Probation Department estimates a base offense level of 30 for the drug offense. See PSR ¶ 19. The government notes that, at the time of the defendant's plea hearing and as reflected in the plea agreement, U.S. Department of Justice guidance required that cocaine base be treated as powder cocaine for purposes of Guideline calculations, to minimize the powder-to-cocaine base sentencing disparity. Specifically, on June 22, 2021, the Department provided public testimony in support of the EQUAL Act, S.79. This proposed legislation would eliminate the powder-to-cocaine base sentencing disparity in 21 U.S.C. §§ 841 and 960. Although the Department supported elimination of the disparity, until legislation to that effect is passed, the current statutory and Guidelines provisions remain in effect. Consistent with its obligation under the plea agreement, the government requests that the Court should consider the powder-to-cocaine base disparity in assessing the Section 3553(a) factors. See Kimbrough v. United States, 552 U.S. 85, 106-08 (2007); United States v. Cavera, 550 F.3d 180, 191-92 (2d Cir. 2008) (en banc).

Grouping Analysis:

    Grouping of Closely Related Counts (U.S.S.G. § 3D1.2)

    Highest Offense Level of the Counts (U.S.S.G. § 3D1.3)     <u>33</u>

    Less:   Global Resolution (U.S.S.G. § 5K2.0)     <u>-1</u>

    Total:     <u>32</u>

Accordingly, assuming a Criminal History Category of III and an offense level of 32, the defendant faces a Guidelines range of 151 to 188 months. The government incorporates by reference the parties' joint May 16, 2025 letter objecting to certain Guidelines calculations in the PSR.

    B.    <u>The Defendant Is Not Entitled to a Reduction for Acceptance of Responsibility</u>

Following his plea of guilty to the instant offenses and his allocution to attempting to destroy or conceal firearms upon arrest, the defendant has continued to commit crimes and possess contraband, including phones and a weapon, at the MDC. Accordingly, he has not clearly demonstrated acceptance of responsibility, and is not entitled to a two-level reduction for acceptance of responsibility under Guideline § 3E1.1(a). Nor does the government intend to make a motion for a one-level reduction under Guideline § 3E1.1(b).

"A defendant who enters a guilty plea is not entitled to an adjustment [for acceptance of responsibility] as a matter of right." <u>United States v. Chu</u>, 714 F.3d 742, 747 (2d Cir. 2013) (citing U.S.S.G. § 3E1.1, cmt. n. 3). "Rather, the defendant bears the burden of demonstrating that he qualifies for such a reduction." <u>Chu</u>, 714 F.3d at 747.

Evidence of acceptance of responsibility—such as a defendant's plea of guilty—"may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1, cmt. n. 3; <u>United States v. Rivera</u>, 96 F.3d 41, 44 (2d Cir. 1996) (holding that district court properly withheld adjustment for acceptance of responsibility because the court concluded "aside from the acknowledgment of guilt by the plea of guilty, there was no credible indication of acceptance of responsibility"); see also <u>United States v. Strange</u>, 65 F.4th 86, 92 (2d Cir. 2023) ("[Defendant's] argument rests on the assumption that a guilty plea and public admission alone are sufficient to warrant the three-level reduction. That is incorrect.").

Under the Guidelines, a relevant factor in deciding whether a defendant has accepted responsibility is his "voluntary termination or withdrawal from criminal conduct or associations." U.S.S.G. § 3E1.1 application note 1(B)). In addition, the Second Circuit has found that

> the fact that a defendant commits a second crime after pleading guilty and while awaiting sentencing for a first offense is a relevant consideration in denying the acceptance of responsibility adjustment

9

> in selecting the sentence for that first offense [because] [t]he second crime refutes the disavowal of future criminal activity implied by the guilty plea to the first crime.

United States v. Rodriguez, 928 F.2d 65, 67 (2d Cir. 1991) (internal citations omitted); see also Chu, 714 F.3d at 747 (denying acceptance of responsibility reduction where defendant smuggled contraband into the MDC); United States v. Wimble, 387 F. App'x 63, 64 (2d Cir. 2010) (affirming district court's denial of acceptance of responsibility reduction where defendant "was involved in multiple crimes subsequent to his guilty plea"); United States v. Woods, 927 F.2d 735, 736 (2d Cir. 1991) (affirming district court's denial of acceptance of responsibility reduction and explaining that "continued involvement in criminal activity casts substantial doubt on the sincerity of a defendant's protestations of contrition, and a court is well within its discretion in considering such involvement in setting a defendant's sentence").

As discussed above, after his guilty plea in this case, the defendant committed multiple violations at the MDC. He possessed numerous contraband cell phones. Photographs from the defendant's contraband phone suggest that he is continuing to engage in narcotics trafficking. In addition to possessing contraband cellular devices, the defendant had a sharpened metal weapon measuring 8.5 inches. Such conduct is not only dangerous in a facility beset by violence, but also a federal crime punishable by up to five years imprisonment. See 18 U.S.C. §§ 1791(a)(2), (b)(3).

Consequently, the defendant cannot meet his burden to demonstrate that he is entitled to a two-level reduction under Guideline § 3E1.1(a), and the government does not intend to make a motion for a one-level reduction under Guideline § 3E1.1(b).

## IV. A 188-Month Term of Imprisonment is Appropriate

The Section 3553(a) factors counsel in favor of a sentence at the top of the Guidelines range, which is based on the Guidelines calculation in the parties' Plea Agreement, not including any reduction for acceptance of responsibility.

First, the sentence that the Court imposes on Minaya should consider the seriousness of the offense and hold the defendant accountable for the grave dangers he posed to others. See 18 U.S.C. §§ 3553(a)(2)(A) and (B). Minaya and his co-conspirators flooded the community with dangerous firearms and narcotics, including guns with obliterated serial numbers, guns used in violent crimes, and easily concealed semi-automatic handguns—conduct this Court found as "inherently dangerous." United States v. Mccann, No. 23-CR-08 (WFK), 2023 WL 2857917, at *4 (E.D.N.Y. Apr. 10, 2023). Minaya sold these firearms and narcotics despite knowing that the buyer was someone who presented himself to be an illegal gun reseller and drug dealer. His sales took place outside of a public housing complex that houses over 4,000 men, women, and children and in a public park in the middle of the spring and summer. Worse still, these sales often occurred in broad daylight, further demonstrating Minaya's brazenness in disobeying the law.

The Court's sentence should also account for the unique dangerousness of Minaya's criminal conduct given that it took place in the Eastern District of New York. In United States v.

10

Cavera, 550 F.3d 180 (2d Cir. 2008), the Second Circuit explained that gun trafficking within the dense urban environment of this District threatens the community's safety in unique ways that are not present elsewhere in the country. Cavera, 550 F.3d at 195; see also id. at 204 (Raggi, J., concurring) ("guns smuggled into New York City are (1) commonly acquired illegally and (2) then used for unlawful purposes … To be sure, if a gunman, in any part of the country, shoots at an intended victim and hits his target, the results are equally tragic.  But if the gunman misses his target, the cited statistics plainly support an inference that the risk of injury, if not death, to a nearby person is many times greater in the Eastern District of New York than in most parts of the country."). Minaya further endangered others by selling significant quantities of narcotics.  He was involved in selling over 80 grams of cocaine base, a toxic and highly addictive drug.  In imposing sentence, the Court should account for Minaya's disregard for the safety of those who live in our community.

The Court should also consider that Minaya attempted to conceal and/or destroy additional firearms and ammunition upon arrest.  Specifically, the defendant attempted to discard firearms and firearm parts, and law enforcement subsequently recovered a loaded Glock 43 handgun from the interior hallway and a handgun and a fully loaded magazine on the ground outside of Minaya's residence.  The Court's sentence should thus reflect that Minaya, as a previously convicted felon, continued to unlawfully possess firearms at the time of his arrest.  Throwing loaded guns in hallway that is publicly accessible, including to children, further illustrates Minaya's disregard for the community's safety, and the need for a serious punishment.

The defendant's criminal behavior while incarcerated also weighs strongly in favor of a top of the Guidelines sentence.  The defendant is a contributor to the current conditions at the MDC.  The government expects that the defendant, like many other MDC inmates, will use those conditions as a reason for this Court to impose a lesser sentence.  But he cannot simultaneously contribute to the dangerous conditions at the MDC and then claim them as a reason he should be granted leniency.  The defendant possessed a dangerous sharp weapon, what appeared to be narcotics, and  multiple contraband phones—including after his plea.  Indeed, contraband smuggling schemes operated by inmates often lead to money-related and other disputes that lead to violence at the MDC—violence that the defendant was plainly prepared for by possessing a dangerous weapon.  The timing and nature of the criminal conduct at the MDC militate in favor of a top of the Guidelines sentence.

Second, the history and characteristics of the defendant strongly weigh in favor of a sentence at the top of the Guidelines range.  See 18 U.S.C. § 3553(a)(1).  The defendant is a repeat offender with a violent criminal history.  He has convictions for attempted murder, violent assaults while in state custody, and a robbery where the defendant punched the victim.  He is a member of the Gorilla Stone Bloods gang and helped arrange the attempted killing of a rival Crips member while incarcerated.  PSR ¶ 52.  Any sentence imposed should account for Minaya's refusal to disavow a life of crime, including while in custody in the state and while awaiting a sentence in this case.

Third, a sentence at the top of the Guidelines range would protect the public from further crimes of the defendant and deter Minaya and others like him.  See 18 U.S.C. §§ 3553(a)(2)(B) and 3553(a)(2)(C).  Multiple serious sentences of incarceration, including a

seven-year prison term between 2013 and 2020, have not deterred Minaya from engaging in the instant gun trafficking and narcotics conspiracy. To the contrary, the defendant committed the instant crimes while on parole. Even during his current incarceration at the MDC, the defendant has flouted prison rules: incurring multiple disciplinary infractions, possessing contraband cell phones and possessing a weapon. Such misconduct rebuts any argument that the defendant has learned from and will not repeat the criminal conduct of which he was convicted. To the contrary, this Court's sentence should protect the public from the defendant, who has committed a series of violent gang-related crimes. It should also demonstrate to the public at large that gun and narcotics trafficking are serious offenses that will lead to a lengthy sentence for those who chose to participate in them.

V. Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence at the top of the applicable Guidelines range, here 188 months' imprisonment.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:  /s/
Adam Amir
Irisa Chen
James R. Simmons
Assistant U.S. Attorneys
(718) 254-7000

cc:  Clerk of the Court (WFK)
     United States Probation Officer (by Email)
     Counsel of Record (by ECF)