**Federal Defenders**
OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director*

Michelle A. Gelernt
*Attorney-in-Charge*

June 17, 2025

By ECF and Electronic Mail
The Honorable William F. Kuntz, II
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:  United States v. Raymond Minaya, 23-cr-8 (WFK)

Dear Judge Kuntz:

  I write on behalf of Raymond Minaya in advance of sentencing. For the reasons set forth below, the defense respectfully requests a sentence that is a significant downward variance from the advisory Guideline range of 108-135 months that has been calculated by the Probation Department, followed by two years of supervised release. A downward variance is warranted in this case based on Mr. Minaya's history and characteristics, which include his traumatic childhood and his commitment to his family, his role in the charged conspiracy, and the conditions he has endured while incarcerated at the Metropolitan Detention Center (MDC).

  The following exhibits are enclosed in connection with this sentencing submission:

| | |
|---|---|
| Exhibit A | Letter from Raymond Minaya |
| Exhibit B | Letter from Maria Rivera (mother) |
| Exhibit C | Letter from Priscilla Minaya (sister) |
| Exhibit D | BOP Certificates of Completion |

  **I.**  **Procedural History**

  On March 15, 2024, Mr. Minaya appeared before this Court and pleaded guilty pursuant to a written plea agreement to Counts One and Six of the indictment, charging him with firearms trafficking conspiracy in violation of 18 U.S.C. § 933(a)(3) (Count One) and conspiracy to distribute and possess with intent to distribute cocaine base in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C) (Count Six). *See* ECF No. 73. Neither of his offenses of conviction carries a mandatory minimum term of imprisonment.

  In the plea agreement, Mr. Minaya stipulated that his total offense level, after a three-level reduction for acceptance of responsibility, was 29. *See id*. ¶ 2. This total offense level resulted from a base offense level for Count One[1] of 22 under U.S.S.G. § 2K2.1(a)(3); a 6-level

---

[1] The offense level calculation for Count One is listed because the parties agree that Counts One and Six group together, *see* U.S.S.G. § 3D1.2(c), and Count One produces the

increase under § 2K2.1(b)(1) because the offense involved more than 25 but less than 99 firearms; a 4-level increase under § 2K2.1(b)(4) because the offense involved at least one firearm with an obliterated serial number; a reduction to offense level 29 because under § 2K2.1, the offense level resulting from the application of §§ 2K2.1(b)(1) through (b)(4) may not exceed 29; a 4-level increase under § 2K2.1(b)(5) because the offense involved the trafficking of firearms;[2] a three-level reduction for acceptance of responsibility and timely notification of intent to plead guilty under § 3E1.1; and a one-level reduction for a global resolution under § 5K2.0. *Id.* The plea agreement further stated that the parties believed Mr. Minaya would fall within Criminal History Category III. *Id.* Combining this offense level and criminal history category, the plea agreement estimated that Mr. Minaya's advisory Guideline range would be 108-135 months. *Id.*

In its initial disclosure of the Presentence Investigation Report (PSR), the Probation Department agreed that Mr. Minaya falls within Criminal History Category III. *See* PSR ¶ 55. However, the PSR calculated Mr. Minaya's offense level differently from the parties, determining that his total offense level was 37. *See* PSR ¶¶ 24-48.

On May 16, 2025, the parties submitted objections to the PSR. Several of those objections were submitted jointly by both the defense and the government. In brief, those joint objections were as follows: (1) the PSR should not have applied a four-level increase to Mr. Minaya's offense level under U.S.S.G. § 2K2.1(b)(6)(B); (2) the PSR should have grouped Counts One and Six together pursuant to § 3D1.2, but did not do so; and (3) the PSR should apply the 2021 Guidelines Manual instead of the current Guidelines, because failing to do so would create an *ex post facto* issue. The defense also submitted a fourth objection, which was that the PSR should have reduced Mr. Minaya's offense level by three levels for acceptance of responsibility under § 3E1.1. The government did not join this objection and maintains that Mr. Minaya should not receive a reduction for acceptance of responsibility due to disciplinary infractions he has incurred while in custody at the MDC.

On June 11, 2025, the Probation Department submitted an Addendum to the PSR that responded to the parties' objections. The Probation Department agreed with each of the parties' joint objections, and also agreed with the defense's fourth objection that Mr. Minaya should receive a three-level reduction for acceptance of responsibility. The Probation Department amended the PSR accordingly. *See* Addendum to PSR. With these amendments, the PSR calculates Mr. Minaya's Guideline range to be the same as the estimate set forth in the plea agreement: 108-135 months, after the one-level reduction for a global resolution pursuant to § 5K2.0.

---

highest offense level of the grouped counts and therefore is the operative count for purposes of the total offense level calculation, *see id.* § 3D1.3(a).

[2] While the 2024 Guidelines Manual provides for different offense level increases under §2K2.1(b)(5), the parties agree that the 2021 Sentencing Guidelines Manual (i.e. the version of the Guidelines applicable at the time of the offense conduct) should be used in Mr. Minaya's case. As discussed in further detail in the Addendum to the PSR, applying the 2024 Guidelines Manual would generate a higher Guidelines range than the version of the Guidelines Manual in effect at the time of the offense and would thus be an *ex post facto* violation. *See Peugh v. United States*, 133 S. Ct. 2072, 2078 (2013) (holding that "there is *an ex post facto* violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense").

## II. The Section 3553(a) factors support a significant downward variance from 108-135 months.

In conducting an analysis of what amounts to a just and proper sentence, this Court is required to consider all the factors set forth in 18 U.S.C. § 3553(a). *See* § 3553(a)(1)-(7). These include the nature and circumstances of the offense and the history and characteristics of the defendant, *id*. § 3553(a)(1), as well as the types of sentences available and the sentence recommended by the Sentencing Guidelines, *id*. § 3553(a)(3)-(4). Ultimately, Section 3553(a) directs this Court to impose a sentence that is "sufficient, but not greater than necessary" to meet the purposes of sentencing. 18 U.S.C. § 3553(a)(2). This "parsimony provision" represents the "overarching" command of the statute. *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007).

In this case, a significant downward variance from 108-135 months is the sentence that is sufficient, but not greater than necessary, to accomplish the purposes set forth in Section 3553(a). Such a sentence appropriately considers Mr. Minaya's history and characteristics, including his incredibly difficult upbringing and dedication to his loved ones; his less-prominent role in the charged conspiracy; and the conditions of his confinement.

### A. *Mr. Minaya's history and characteristics support a significant downward variance from 108-135 months.*

Several aspects of Mr. Minaya's history and characteristics demonstrate why a sentence significantly less than 108-135 months is appropriate. Mr. Minaya's childhood was defined by poverty, experiences with homelessness, and exposure to drug use and violence that contributed to him being incarcerated during some of his most formative years. However, Mr. Minaya has shown the ability and willingness to make changes in his life to remove himself from negative influences, and has every intention of doing so in the future. To understand how Mr. Minaya ended up before this Court, it is important to understand his history.

Raymond Minaya Jr. was born in 1996 in Brooklyn, New York to Maria Rivera and Raymond Minaya Sr. PSR ¶ 60. Mr. Minaya was raised by both his mother and father, but recalls that his father would come and go and would frequently be absent from the home for long periods of time. Mr. Minaya described his childhood as "terrible." *Id*. ¶ 62. Mr. Minaya spent his early years in Bushwick, living in public housing in a dangerous area where he was afraid to step outside. *Id*. Mr. Minaya recalls being extremely poor and not having a bed to sleep in. When he was approximately eight years old, Mr. Minaya recalls that he and his mother moved into a homeless shelter because they had nowhere else to go. *Id*. While he does not remember exactly how long they were there, in conversations with defense counsel Mr. Minaya recalled that he was in the shelter for several months.

After leaving the shelter, Mr. Minaya and his mother moved into the Bayview Houses, a public housing project in Canarsie, where they have lived ever since. While Mr. Minaya was happy to have left the homeless shelter behind, his new neighborhood offered no relief from what he had endured to that point. Still just a child, Mr. Minaya felt the devastating effects of poverty and hunger every day. He had no bed, so he slept on blankets on the floor; his family used the oven to warm the apartment in the winter because they could not afford heat; and he recalls seeing his mother crying because there was not enough food to feed him and his younger sisters. In addition, his new neighborhood was very dangerous and Mr. Minaya was still afraid to go outside. As he stated in his presentence interview, while still just a child, Mr. Minaya recalls

witnessing horrific violence in his neighborhood, including stabbings, shootings, and assaults by police officers. Mr. Minaya could not escape the violence at school, either. He was beaten up several times at school simply for being from the "wrong" housing project.

Despite these horrible experiences, Mr. Minaya was fiercely devoted to his family. While he and his siblings are not close with their extended family, who view them as outcasts, Mr. Minaya is very close with his immediate family. As his younger sister Priscilla writes, Mr. Minaya "would help me figure out things I was confused about, struggled with and just lead me as an older brother with advice to better myself." Exhibit C (Letter from Priscilla Minaya). Priscilla describes how when he was growing up, Mr. Minaya was close with his uncle Manny, who was just two years older than him and was mute and deaf. *Id*. Although Mr. Minaya was the younger of the two, he would "watch over [his uncle] like he was the older one or the uncle. He never let anybody make fun of him or tease him about his condition, he would bring our uncle outside to live a regular life . . . ." *Id*. Mr. Minaya would also help his mother, who was in poor health, by "cook[ing] food, get[ting] groceries, get[ting] her medicine, store runs, buying her clothes, getting her to her doctor appointments . . . ." *Id*. He cared for his grandmother in a similar fashion, who was sick with diabetes. *Id*.; *see also* Exhibit B (Letter from Maria Rivera).

The responsibility Mr. Minaya felt to take care of his family was not limited to providing support at home; he felt a financial burden as well. When he was as young as 11 or 12 years old, Mr. Minaya began packing bags at the local supermarket to make extra money to give to his mother. PSR ¶ 66. But by the time he was 16 or 17, the responsibility Mr. Minaya felt started to become misdirected. He began spending more time in the streets and around individuals who were negative influences on him. And in 2013, when Mr. Minaya was just 17 years old, he was arrested and convicted of attempted murder and sentenced to seven years in prison. *Id*. ¶ 51. Thus, at an age when most of his peers were graduating high school, exploring their interests, pursuing higher education or starting careers, and forging their own identities as young adults, Mr. Minaya was behind bars in adult prison, trying to survive any way he could.

Those seven years in custody were extremely difficult for Mr. Minaya. He suffered injuries at the hands of corrections officers and spent many months in solitary confinement at a young age. *Id*. ¶ 75. When he was finally released in 2020, at the age of 24 and in the height of the COVID-19 pandemic, Mr. Minaya resolved to make a change. He decided not to return to his mother's neighborhood, hoping to avoid the environment that had led to his incarceration in the first place. *Id*. ¶ 67. He instead went to Bushwick and lived with his grandmother for a year. *Id*. Mr. Minaya found stable employment in 2021, which was no small feat for a person with his record. He worked first at 4Corn Food Corps and later at BJ's Wholesale Club. *Id*. ¶¶ 83-84. While the pay was low and not enough to help his family financially, Mr. Minaya was slowly rebuilding his life after years of incarceration.

Unfortunately, in a decision he would later regret, Mr. Minaya eventually returned to live with his mother in Canarsie. And in early 2022, feeling responsible for doing more to financially help his family after spending seven years away from them, Mr. Minaya had an enormous error in judgment. He participated in a scheme that originated with his co-defendant, David McCann, to sell firearms (and later, drugs) to an undercover officer, and continued to participate for several months after Mr. McCann introduced him to the officer.

Mr. Minaya feels enormous regret for what he did. He understands that by giving into the pressure to try to assist his family, he exacerbated some of the very same dangers in his

community that he experienced growing up. As he writes to the Court, "I [have] found myself closely examining how I've approached survival, in general, through the years. . . . [S]heer survival can encourage us to resort to shortcuts and make poor judgements, in an effort to succeed. I did precisely that, I regret those poor decisions, and I am remorseful for the damaging consequences to everyone affected . . . ." Exhibit A (Letter from Raymond Minaya). He is determined not to let his mistakes define him and is committed to using his time in custody productively. *See, e.g.*, Exhibit D (MDC Certificates of Completion).

Certainly, this history does not excuse Mr. Minaya's conduct, and he does not attempt to make such an excuse. But his history does provide important context for his actions, and we respectfully request that the Court take that context into consideration in evaluating our requested sentence.

### B. *Mr. Minaya did not have the central role in the conspiracy.*

The Court must also consider the nature and circumstances of the offense, and doing so supports our request for a downward variance from Mr. Minaya's advisory Guideline range of 108-135 months. Mr. Minaya was not the central member of the conspiracy. Rather, it was Mr. McCann who first met the undercover officer in early January of 2022 and sold drugs and guns to him on multiple occasions. *See* PSR ¶¶ 8-9; Gov't Sent'g Ltr. for David McCann, ECF No. 99 at 1. Mr. McCann was the one who introduced the undercover officer to Mr. Minaya, as well as to the other two co-defendants in this case and to other uncharged co-conspirators. ECF No. 99 at 1-2. At times, Mr. McCann would ask his co-conspirators for payment from their sales with the undercover officer, PSR ¶ 9, and Mr. McCann stated that "every transaction goes through me," ECF No. 99 at 2. And while the Court did not apply a leadership role enhancement to Mr. McCann, it is notable that the Probation Department recommended that this enhancement be applied to him. *See* ECF No. 99 at 5.
'

Mr. Minaya, by contrast, was introduced to the undercover officer several months after Mr. McCann had already begun selling him firearms and drugs. *See* PSR ¶ 10. While Mr. McCann was personally involved in virtually all of the gun and drug sales to the undercover, Mr. Minaya was involved in far fewer than half of them. *See id*. ¶¶ 12-13. Mr. Minaya did not seek, nor did he receive, compensation from any sales that he himself did not participate in, nor did he introduce other co-conspirators to the undercover officer.

Mr. McCann was ultimately sentenced by this Court to 108 months in custody, at the high end of his applicable Guideline range. While there are differences between Mr. McCann and Mr. Minaya in terms of their criminal histories, there are also crucial distinctions with respect to their levels of culpability in the charged conspiracy. Put simply, Mr. Minaya's conduct was far less extensive A significant downward variance from the 108-135 month range accounts for these substantial differences in each defendant's role and fulfills the purpose of avoiding unwarranted sentencing disparities.

### C. *Mr. Minaya's conditions of confinement warrant a downward variance.*

The abhorrent conditions Mr. Minaya has endured while incarcerated at the MDC also warrant a significant downward variance. Mr. Minaya has personally experienced inadequate medical care, witnessed increased violence, and, most impactful for him, constant and unrelenting lockdowns. Lockdowns at the MDC mirror solitary confinement, with detainees

being confined to their cells for a minimum of 22 hours a day, social visits suspended and almost no access to the phones. In addition to the lack of human contact during lockdowns, access to other basic necessities is significantly limited – only cold food is served, opportunities to buy hygiene products through commissary are limited and repeated requests for medical care go unanswered.

Mr. Minaya's experience at MDC comports with the documented horrific conditions at the facility. MDC is a facility that courts, correctional staff, and incarcerated people have all recognized is inhumane. *E.g., United States v. Tiffany Days*, no. 19-cr-0619 (S.D.N.Y. Apr. 29, 2021) (describing the conditions at MCC and MDC as "inhumane," what one "associates with a third world country," ones that "nobody in detention … should have to endure"); AFGE Local 2005, Council of Prison Locals #33, AFL-CIO, "Unsafe Working Conditions," Mem. of June 23, 2023 (memo from correctional officers union explaining that conditions at MDC are "inhumane to both staff and inmates," as the jail is "severely understaffed," leaving units "unmanned by staff"). As Judge Furman recently wrote, "the time has come to recognize that . . . there is no way the grim conditions at the jail will materially improve until the grave staffing shortages are addressed. And that … seems unlikely to happen any time soon. Until that time comes, the best the courts can do is not add unnecessarily to the inmate population and thereby avoid exacerbating the already frightening staff-to- inmate ratio." *United States v. Chavez*, No. 22 CR 303 (JMF), 2024 WL 50233, at *9 (S.D.N.Y. Jan. 4, 2024). Regular confinement at MDC is "tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane." *Id*. at *5.

Building on those remarks, Judge Brown recently explained that a lower sentence was warranted because of the "dangerous, barbaric conditions that have existed for some time at the Metropolitan Detention Center ("MDC") in Brooklyn." *United States v. Colucci*, 23-cr-417 (GRB), 2024 WL 3643857, *1 (Aug. 5, 2024). Judge Brown detailed these conditions at length, noting that "Chaos reigns, along with uncontrolled violence." *Id.* at * 4. This violence included, "two apparent homicides, two gruesome stabbings and an assault so severe that it resulted in a fractured eye socket for the victim." *Id.* at *4-5.

Judge DeArcy Hall also recently explained the considerations that go into her decision to sentence someone who has served, or will serve, time at MDC. She stated:

> I need to say this on the record as often as possible until the Government does what it needs to do to ensure that the conditions at MDC change. It is affecting the way in which judges are imposing sentences.
>
> It is, in some cases, requiring us, **demanding that we sentence people for less time in jail** than we otherwise would because the Government has failed to ensure that the conditions at MDC are improved and are improved at a level commensurate with what I believe is this great nation.

*United States v. Bayron Garcia*, 23-cr-56 (April 10, 2024) (emphasis added).

In determining whether and how much longer Mr. Minaya needs to be incarcerated, the Court should weigh the increased danger and inhumane conditions to which he has been subjected when determining the "total harm and benefits to prisoner and society" that additional imprisonment would yield. *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case"); *United States v. Francis*, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (reducing sentence in acknowledgment of "the qualitatively different, substandard conditions to which the Defendant was subjected" in pretrial detention). Because Mr. Minaya's pretrial incarceration has been exceptionally challenging, it has been a greater punishment and deterrent than it would have been otherwise. As such, a downward variance is warranted.

### III. The Court should reject the government's attempt to deny Mr. Minaya a reduction in offense level for acceptance of responsibility.

Finally, the Court should deny the government's attempt to use Mr. Minaya's disciplinary infractions at MDC to take away his reduction in offense level for acceptance of responsibility.

Under the Guidelines, a defendant is entitled to a two- or three-level reduction in offense level if he "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). Application Note 1 to Section 3E1.1 lists a number of nonexhaustive considerations a district court may take into account in making this decision. These considerations include "voluntary termination or withdrawal from criminal conduct or associations." *Id.*, App. Note 1(B). This is far from the only consideration, however; the application note lists a number of others. As relevant here, these include: truthfully admitting the conduct that constitutes the offense of conviction and any relevant conduct, App. Note 1(A); the defendant's post-offense efforts at rehabilitation, App. Note 1(G); and the timeliness with which the defendant manifests acceptance of responsibility, App. Note 1(H). Notably, pleading guilty in a timely fashion, truthfully admitting the conduct constituting the offense of conviction, and truthfully admitting or not falsely denying relevant conduct, while not dispositive, is "significant evidence" of acceptance of responsibility. *Id.* at App. Note 3.

Mr. Minaya has met these requirements for acceptance of responsibility. He accepted the government's plea offer, timely notified the government and the Court of his intention to plead guilty, truthfully admitted the conduct underlying the counts of conviction, and has not frivolously or falsely denied any relevant conduct. Indeed, Mr. Minaya decided to accept responsibility for his actions and plead guilty before even filing a single pretrial motion.

That Mr. Minaya has been disciplined for breaking the rules relating to possessing contraband at the MDC—a circumstance that, while certainly regrettable, is extremely common for individuals held in custody there—should not result in the loss of the acceptance of responsibility reduction (and resulting years-long increase in his advisory Guideline range). Reductions in offense level for acceptance of responsibility have typically been denied in cases affirmed by the Second Circuit as to defendants who pled guilty based on post-plea misconduct where there was some correlation between the underlying crime of conviction and the new

criminal conduct. The defendant in *United States v. Chu* was convicted of drug crimes and repeatedly sought to smuggle drugs into the jail. *United States v. Chu*, 714 F.3d 742 (2d Cir. 2013). In *United States v. Warren* the defendant was convicted of racketeering based on multiple acts of violence and engaged in an apparently planned assault with associates at the jail. *United States v. Warren*, No. 22-611, 2023 WL 5971115, at *2 (2d Cir. Sept. 14, 2023). In *United States v. Hill*, the defendant was convicted of assaulting a corrections officer and subsequently threatened another officer at the jail. *United States v. Hill*, No. 22-1536, 2024 WL 831676, at *2 (2d Cir. Feb. 28, 2024), cert. denied, No. 23-7583, 2024 WL 4426921 (U.S. Oct. 7, 2024).

There is no similar correlation here between the alleged misconduct and the crime of conviction. Mr. Minaya, who has pleaded guilty to a gun trafficking and drug distribution conspiracy, has been disciplined for possessing a cell phone on multiple occasions and possessing (but not using) a sharpened metal object on one occasion.[3] Despite the government's efforts to show otherwise, Mr. Minaya has not been charged with—nor has he been found guilty of—using or distributing controlled substances. As the government and the Court are well aware, the MDC is an incredibly dangerous place and has been for years. Indeed, Mr. Minaya's possession of the sharpened object, which occurred in November 2024, came less than two months after federal charges were announced against a number of inmates at MDC for a series of incredibly violent incidents that took place there that summer. *See* U.S. Dept. of Justice, *Federal Charges Announced Against Inmates for Violent Crimes Committed in Metropolitan Detention Center in Brooklyn* (Sept. 30, 2024).[4] These included two murders in June and July of 2024, an attempted murder in April 2024, and two violent assaults in August 2024. *Id*. Possessing an object to protect himself against the well-documented dangers of the MDC cannot fairly be said to be evidence that Mr. Minaya has not accepted responsibility for his conduct or withdrawn from criminal activity. Mr. Minaya did not use or threaten to use the object, nor was he ever seen brandishing it; it was merely inside his cell, arguably as a deterrent to others or as emergency protection given the recent violent incidents there. Similarly, given the frequent and lengthy lockdowns discussed above, which primarily result from severe and systematic understaffing at the MDC, it can be next to impossible to communicate with one's family for days or weeks on end. Under these circumstances, possessing a cellphone for purposes of communication does not warrant loss of a reduction in offense level for acceptance of responsibility.

Several judges in this District who have faced similar arguments from the government have refused to deny reductions for acceptance of responsibility for defendants accused or found guilty of disciplinary infractions at the MDC. *See, e.g.*, *United States v. Gale*, no. 23-cr-403 (ARR) (declining to take away acceptance of responsibility for defendant found guilty at the MDC of possessing a dangerous weapon, destruction of property, and assault); *United States v. Deloatch*, no. 21-cr-457 (ENV) (declining to take away acceptance of responsibility for defendant accused of perpetrating a stabbing against another inmate at the MDC). *See also United States v. McQueen*, no. 20-cr-315 (RPK) (declining to take away acceptance of responsibility for defendant released on bond for, *inter alia*, possession of a weapon following a high-speed chase over the George Washington Bridge).

---

[3] As demonstrated by the incident reports provided by the government, Mr. Minaya has already been punished severely by the MDC for his conduct. He lost a total of 82 days of good conduct time, 210 days of phone privileges, and a full year of visit privileges. *See* Gov't Sentencing Ltr. at 5, Ex. A-C (ECF No. 130).

[4] *Available at* https://www.justice.gov/archives/opa/pr/federal-charges-announced-against-inmates-violent-crimes-committed-metropolitan-detention.

      In opposing the government's effort to deny a reduction for acceptance of responsibility, the defense does not suggest that the Court cannot consider Mr. Minaya's conduct at the MDC. The Court clearly can and should take his conduct into account when evaluating the appropriate sentence under Section 3553(a). The defense merely believes that Mr. Minaya's conduct that the MDC, viewed in its proper context, does not warrant the loss of the reduction for acceptance of responsibility—and that, when evaluating the Section 3553(a) factors in totality, this conduct is outweighed by the remaining factors outlined above.

### IV.     Conclusion

      For the reasons discussed above, Mr. Minaya respectfully requests that the Court impose a sentence that is a significant downward variance from the Guideline range of 108-135 months as calculated by the Probation Department in the PSR Addendum. This sentence is sufficient, but not greater than necessary, to accomplish the purposes of sentencing.

      Thank you for your consideration of this matter.

                                                           Respectfully Submitted,

                                                           */s/ Jeffrey S. Dahlberg*
                                                           Jeffrey S. Dahlberg
                                                           Mia Eisner-Grynberg
                                                           Counsel to Raymond Minaya
                                                           Federal Defenders of New York Inc.

cc:     AUSA Adam Amir
          AUSA Irisa Chen
          AUSA James Simmons