

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AA/IC/JRS
F. #2023R00212

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 25, 2025

By ECF

The Honorable William F. Kuntz II
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Calvin Tabron
                Criminal Docket No. 23-8 (WFK)

Dear Judge Kuntz:

      The government respectfully submits this letter in advance of defendant Calvin Tabron's sentencing, which is scheduled for Wednesday, July 2, 2025 at 11:00 a.m. On March 28, 2024, the defendant pleaded guilty to firearms trafficking conspiracy, in violation of 18 U.S.C. §§ 933(a)(3) and 933(b). For the reasons set forth below, a sentence within the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 63 to 78 months of incarceration is appropriate here.

      I.    Background

      The defendant participated in a large-scale firearms trafficking ring that operated around the Breukelen Houses, a public housing complex located in the Canarsie neighborhood in Brooklyn, New York. Specifically, Tabron acted as a straw purchaser for the gun trafficking ring and purchased firearms in Virginia that he and co-defendant Tajhai Jones then brought to New York. In doing so, Tabron was a key conduit and supplier of guns, without whom the scheme could not succeed. An image of Tabron selling firearms illegally is below.



Over the course of the government's investigation, Tabron and his co-conspirators sold over 50 guns to an undercover law enforcement officer (the "UC"), who posed as a drug dealer. See Presentence Investigation Report, dated November 4, 2024 ("PSR") ¶¶ 5, 10-12. The defendants, of course, did not believe they were selling guns to a law enforcement officer. Instead, the UC told the defendants that he was a drug dealer who needed guns and that he was also going to resell some of the guns that were provided to him. See PSR ¶ 6. Despite this knowledge, Tabron and his co-conspirators continued to sell large quantities of guns to the UC without hesitation. Other co-conspirators sold fentanyl and cocaine base to the UC.

In May 2022, Tabron, along with co-defendant Jones were introduced to the UC by Mccann. PSR ¶ 10. Tabron and Jones lived in Virginia and took advantage of its relatively lax gun laws. There, Tabron would buy firearms as a straw purchaser. Id. The investigation revealed that defendant Tabron would often purchase three or four guns at a time from retailers in Virginia, near where Tabron lived, for the express purpose of bringing them to Brooklyn to engage in sales set up by his co-defendants. Id. Tabron and Jones then brought the firearms to New York to sell, with Mccann acting as the intermediary with the UC. Id. Over the course of approximately five months, Tabron trafficked 18 firearms from Virginia to New York. See id. ¶ 11. Many of the guns sold by Tabron were handguns that could be easily concealed.

The co-conspirators' gun sales took place primarily in vehicles outside of homes in the Breukelen Houses complex. Almost all of the sales occurred in the middle of the afternoon and in broad daylight, with the co-conspirators sometimes brazenly walking down public streets carrying bags of dangerous guns. Certain transactions also took place during the summer months at the Canarsie Pier—a popular recreational area where scores of Brooklyn families kayak, picnic, and play with their children at the playground.

Notably, on September 19, 2022, when agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") interdicted and intercepted Tabron after Tabron attempted to purchase a Taurus G2C 9 mm caliber semi-automatic pistol from Superior Pawn & Gun in Virginia Beach, the defendant lied about his criminal activity and claimed that he had been collecting firearms and buying firearms for family members, among other things. Ultimately, ATF agents seized the firearm that Tabron had just purchased, which he claimed was intended for Tabron's father. The next day, eager to re-engage in straw purchasing, Tabron called one of the ATF agents who had spoken with him and asked when the "cease and desist" on his firearms purchasing would end. Tabron was advised that he would not be able to purchase additional firearms for the duration of the investigation.

II.    Applicable Law

The Supreme Court has explained that a "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).

Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume

2

that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Specifically, 18 U.S.C. § 3553(a) requires that, in imposing a sentence, a court shall consider:

>    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>    (2) the need for the sentence imposed—
>
>    >    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>    >
>    >    (B) to afford adequate deterrence to criminal conduct;
>    >
>    >    (C) to protect the public from further crimes of the defendant; and
>    >
>    >    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

### III. Analysis

#### A. The Parties' Stipulated Guidelines Range

The Guidelines offense level to which the defendant stipulated in the plea agreement is as follows:

Count One: Gun Trafficking Conspiracy:

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2K2.1(a)(4)) | 20 |
| Plus:  More than 25 Firearms (U.S.S.G. § 2K2.1(b)(1)) | +6 |

| | | |
|---|---|---:|
| Plus: | Trafficking of Firearms (U.S.S.G. § 2K2.1(b)(5)) | +4[1] |
| Less: | Global Resolution (U.S.S.G. § 5K2.0) | -1 |
| Less: | Timely Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)-(b)) | -3 |
| Total: | | <u>26</u> |

Accordingly, based on a Criminal History Category of I, see PSR ¶¶ 36-45, a total adjusted offense level of 26 would yield a Guidelines advisory range of 63 to 78 months of imprisonment. The defendant has stipulated to the applicable Guidelines range. Plea Agreement ¶ 2.

    B.    The PSR's Guidelines Range

The PSR's Guidelines estimate differs from the range stipulated to by the parties in the plea agreement. The PSR adds two-levels pursuant to an enhancement in the 2024 Guidelines Manual under U.S.S.G § 2K2.1(b)(5). The government disagrees with (a) the use of the 2024 Guidelines Manual, and (b) how this enhancement is applied. Instead, the government submits that the Court should apply of the version of the Guidelines in effect at the time of the offense conduct (i.e., the 2021 Manual), and thus a four-level enhancement for gun trafficking is correct.

Under the 2024 Guidelines Manual, U.S.S.G § 2K2.1(b)(5) governs enhancements for gun trafficking. Under U.S.S.G § 2K2.1(b)(5)(c), five levels are added, if, as is true here, a defendant "transported, transferred, sold, or otherwise disposed of, or purchased or received with intent to transport, transfer, sell, or otherwise dispose of, two or more firearms knowing or having reason to believe that such conduct would result in the receipt of the firearms by an individual who … intended to use or dispose of the firearms unlawfully" or "attempted or conspired to commit [such] conduct." In this case, the UC posed as a drug dealer who needed guns and who said that he was also going to resell some of the guns the defendants sold to him. Because it is unlawful to sell firearms to criminal resellers and illegal for drug dealers to possess firearms, the defendant's sales were to someone who "intended to use or dispose of the firearms unlawfully." Thus, five levels should be added.

Under the 2021 Guidelines, however, U.S.S.G § 2K2.1(b)(4) adds four levels if the defendant engaged in the trafficking of firearms. Because application of the 2024 Guidelines would generate a higher Guidelines range than the version of the Guidelines Manual in effect at the time of the offense, the Court should apply the 2021 Guidelines Manual, as contemplated in the parties' plea agreement, to avoid an <u>ex post facto</u> violation. See <u>Peugh v. United States</u>, 133 S. Ct. 2072, 2078 (2013) (holding that "there is an <u>ex post facto</u> violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense").

---

[1]     The Probation Department's estimate increases two levels, instead of four, for this enhancement. <u>See</u> PSR ¶¶ 17, 27. As discussed below, the government disagrees.

      C.      A Guidelines Sentence Is Appropriate

The starting point at sentencing, in this as in every case, is the recommendation of the Sentencing Commission embodied in the Guidelines calculation. "[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" Kimbrough v. United States, 552 U.S. 85, 109 (2007); see also United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."). That is because "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale." Rita v. United States, 551 U.S. 338, 348 (2007). However, sentencing courts "may not presume that the Guidelines range is reasonable" because the final assessment must be individualized. Gall, 552 U.S. at 39; see also Rita, 551 U.S. at 351 ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."); cf. id. at 352–55 (explaining why appellate courts—unlike sentencing courts—may presume the reasonableness of Guidelines sentences but may not presume unreasonableness of non-Guidelines sentences).

The sentence that the Court imposes on Tabron should hold him accountable for the grave dangers he posed to others simply to line his pockets and should deter him and others similarly situated from engaging in gun trafficking. Tabron profited by flooding our community's streets with lethal and easily concealable guns. And he did so outside of a public housing complex that houses over 4,000 men, women, and children and in a public park in the middle of the spring and summer. Worse still, these sales often occurred in broad daylight, further demonstrating the defendant's brazenness in disobeying the law. Moreover, as the Court is aware, once firearms are introduced to communities within the Eastern District of New York, they often are resold or relocated after they have been used to commit violence and remain in circulation and available for future criminal use. For example, co-defendant Raymond Minaya sold the UC two firearms that were used in prior shootings that resulted in victims sustaining bodily injuries. PSR ¶ 9. By trafficking 18 handguns into Brooklyn, the defendant introduced deadly weapons into the community that, had they not been intercepted by the UC, likely would have been used to facilitate additional violent crimes.

The Court's sentence should also account for the unique dangerousness of Tabron's criminal conduct given that it took place in the Eastern District of New York. In United States v. Cavera, 550 F.3d 180 (2d Cir. 2008), the Second Circuit affirmed a district court's upward departure[2] on this basis that gun trafficking within the Eastern District of New York threatens the community's safety in specific ways that are not present elsewhere in the country:

> [U]rban areas have higher homicide rates than suburban and rural areas; that in those parts of New York City included in the Eastern District of New

---

[2] For the avoidance of doubt, the government does not seek an upward departure in this case, but instead seeks a sentence within the Guidelines range.

5

>York, population density sometimes exceeded 35,000 persons per square mile when the national average was only 78 persons per square mile; and that guns smuggled into New York City frequently end up in the hands of persons not legally authorized to possess them and are used for illegitimate purposes . . . From these circumstances, [the district court] concluded that firearm trafficking into New York City, and specifically into those boroughs in the Eastern District of New York, presented a greater risk of harm.

Cavera, 550 F.3d at 195; see also id. at 204 (Raggi, J., concurring) ("guns smuggled into New York City are (1) commonly acquired illegally and (2) then used for unlawful purposes . . . We would only have to look through our own docket history to take judicial notice of the fact that the Eastern District of New York is home to the city's five traditional organized crime families, numerous large-scale narcotics enterprises, and street gangs of all stripes—for all of whom guns are tools of the trade and gun violence a routine form of communication. . . To be sure, if a gunman, in any part of the country, shoots at an intended victim and hits his target, the results are equally tragic. But if the gunman misses his target, the cited statistics plainly support an inference that the risk of injury, if not death, to a nearby person is many times greater in the Eastern District of New York than in most parts of the country."). In imposing sentence, the Court must account for Tabron's disregard for the safety of those who live in the community.

       The defendant argues that a non-incarceratory sentence is warranted because this is his first criminal conviction. The government recognizes that defendant Tabron does not have a prior criminal history, including most significantly, no prior felony conviction. However, it must also be noted that this precise characteristic—the lack of a prior felony conviction—enabled Tabron to act as a straw purchaser, a pivotal role in the conspiracy. Moreover, the defendant's conduct in this case was not a one-time aberration—rather, he sold guns repeatedly over the span of five months—and even sought to purchase more guns after ATF agents intervened and tried to stop his criminal conduct. Such persistent criminal conduct demands a punishment within the Guidelines to hold the defendant accountable and deter others like him. In addition, co-defendant Mccann had no criminal history, but nevertheless received a substantial sentence of 108 months of incarceration for his role in the conspiracy. A non-incarceratory sentence, therefore, would create unwarranted sentencing disparities.

       Accordingly, the Section 3553(a) factors weigh in favor of a sentence within the applicable Guidelines range of 63 to 78 months of imprisonment.

IV.	Conclusion

        For the foregoing reasons, the government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 63 to 78 months of incarceration.

        Respectfully submitted,

        JOSEPH NOCELLA, JR.
        United States Attorney

By:    /s/
        Adam Amir
        Irisa Chen
        James R. Simmons
        Assistant U.S. Attorneys
        (718) 254-7000

cc:    Clerk of the Court (WFK)
       United States Probation Officer Nicole Gervase
       Counsel of Record (by ECF)